**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In re: Pro-Mark Services, Inc.,<br><br>Debtor. | Bankruptcy No. 24-30167<br>Chapter 7 |
| Capital Credit Union,<br><br>Plaintiff,<br><br>vs.<br><br>Pro-Mark Services, Inc., Erik Ahlgren, as Trustee for Debtor's Estate; United States Air Force; and Hartford Accident and Indemnity Company,<br><br>Defendants. | Adversary No. 25-7001 |

**MEMORANDUM AND ORDER**

## I. INTRODUCTION

Plaintiff Capital Credit Union (CCU) filed a Complaint seeking declaratory relief resolving competing claims to payment owing to Debtor Pro-Mark Services, Inc., for work performed on federal contracts. It also seeks declaratory relief resolving competing claims to Pro-Mark's personal property. Specifically, CCU seeks determinations that Pro-Mark owns all legal and equitable interest in Pro-Mark's accounts receivables and the accounts receivables constitute property of the estate under 11 U.S.C. § 541(a); CCU's security interest in the accounts receivable is superior to any competing claims; Pro-Mark owns all legal and equitable interest in Pro-Mark's equipment and the equipment constitutes property of the estate under 11 U.S.C. §

541(a); and CCU's security interest in the equipment is superior to any competing claims.

Chapter 7 Trustee Erik Ahlgren filed an Answer on behalf of Pro-Mark's estate, requesting determinations that Pro-Mark owns all legal and equitable interests in the equipment, including titled vehicles, trailers or other personal property subject to a certificate of title, and Pro-Mark's equipment constitutes property of Pro-Mark's estate under 11 U.S.C. § 541(a); CCU holds a properly perfected security interest in the equipment other than titled vehicles, trailers or other personal property subject to a certificate of title; CCU's security interest in titled vehicles, trailers or other personal property subject to a certificate of title is subject to avoidance under 11 U.S.C. § 544 and that the parties have agreed that the estate is entitled to retain all proceeds from the sale of titled vehicles, trailers or other personal property subject to a certificate of title.

In its Answer, the United States asserted that CCU's Complaint lacks subject matter jurisdiction to the extent that it seeks to establish a claim against the United States for money damages, the Complaint fails to state a claim upon which relief may be granted, the United States is not a proper party, and CCU lacks standing against the United States.

Hartford Accident and Indemnity Company, the surety that executed payment and performance bonds on behalf of Pro-Mark, filed an Answer, asserting various affirmative defenses. Hartford performed some of Pro-Mark's obligations when Pro-Mark failed to do so and seeks reimbursement by claiming an interest in federal construction contract payments and insurance proceeds Pro-Mark received or is entitled

to receive. Specifically, Hartford asserted a counterclaim for breach of contract and seeks determinations that Hartford has an interest superior to CCU in the $587,707.49 owed to Pro-Mark from work performed on Air Force contracts. Hartford also claims an interest superior to CCU in Pro-Mark's equipment used on bonded contracts. Additionally, Hartford asserted crossclaims seeking determinations that Hartford's interest in the earned but unpaid bonded contract proceeds is such that the funds should not become part of Pro-Mark's estate, and Hartford's interest in Pro-Mark's equipment (or the proceeds derived from the sale of Pro-Mark's equipment) are owed to Hartford and should not become part of the bankruptcy estate. Finally, Hartford seeks a determination that it has the right to bonded contract funds deposited in the account that CCU setoff.

CCU filed an answer to Hartford's counterclaims. The Trustee also filed a response to Hartford's answer and counterclaims and crossclaims. Likewise, the United States filed an answer to Hartford's crossclaims.

In May 2024, CCU brought a motion for relief from the automatic stay in Pro-Mark's main bankruptcy case seeking to set off $3,306,470.14 in deposit accounts against Pro-Mark's indebtedness to CCU. Hartford objected. After a hearing, the Court granted CCU's motion, prompting CCU to set off the full sum held in Pro-Mark's deposit accounts.[1]

[1] According to Hartford, when CCU's Motion for Relief from Stay was before the Court, "Hartford had not yet received and paid bond claims and incurred losses on its bonded projects, and, thus, likely could not have utilized the doctrine of equitable subrogation. Now – and at the time this Adversary proceeding was initiated – Hartford had paid millions of dollars in bond claims and is equitably subrogated to both the obligee on bonded projects and its principal, Pro-Mark." Doc. 58 at 29 n.6.

Hartford appealed the Court's ruling on the motion for relief from the automatic stay to the Bankruptcy Appellate Panel, which reversed the Court's ruling and remanded the case for further proceedings.

On March 6, 2026, CCU filed a Motion for Summary Judgment with a brief in support of it, seeking judgment on all of its claims and causes of action. On the same day, Hartford filed a Motion for Summary Judgment and supporting brief, seeking judgment on its counterclaims and crossclaims. The United States also filed a Motion for Summary Judgment and supporting brief. The parties filed response and reply briefs.

Each of the parties maintains there is no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. In support of this proposition, the parties submitted a Stipulated Statement of Undisputed Material Facts.

The Court's findings, conclusions and rulings follow.

## II. FINDINGS OF FACT

The Court adopts the facts as stipulated by the parties. Doc. 56. Additionally, to the extent not included in the Stipulated Statement of Undisputed Material Facts, the Court finds:

From October 8, 2020, to September 28, 2022, Hartford executed construction surety bonds on behalf of Pro-Mark and for the benefit of the Air Force and Space Force. The bonds carry a total penal sum of $16,716,186.00.

On July 14, 2020, and July 8, 2022, as consideration for and in connection with the execution of the Air Force/Space Force Bonds and other bonds executed for government agencies, Pro-Mark and the individual owners of Pro-Mark executed General Indemnity Agreements in favor of Hartford. Doc. 58-3.

According to Brian Bragg, a claims consultant for Hartford, Pro-Mark filed its bankruptcy petition on April 22, 2024, and "thereafter" ceased work on all its active construction projects. Doc. 58-2 at ¶ 8. The Air Force and Space Force contracts were at various stages of performance when Pro-Mark ceased work on them.

Hartford received and paid payment bond claims on the following Pro-Mark projects in the following sums:

- Minot Air Force Base $795,799.79
- Offutt Air Force Base $183,819.00
- Grand Forks Air Force Base $156,937.50
- Cavalier Space Force Station $92,862.41
- Buckley Space Force Base $86,935.73

To date, Hartford paid $2,092,448.30 in payment bond payments and $2,854,639.44 in performance bond payments on federal contracts it bonded on behalf of Pro-Mark.

Hartford received $2,736,354.92 in remaining contract balances from the federal government on projects Hartford elected to complete as the performing surety. Hartford's current losses total at least $2,210,732.82 on bonded government contracts.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and authority to enter a final order in this matter. This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### B. Summary Judgment

Summary judgment is appropriate when there is no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial responsibility of identifying pleadings, discovery, testimony and other evidence which it believes demonstrate "the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323. The moving party satisfies this burden by showing "an absence of evidence to support the nonmoving party's case." Id. at 325. The Court must deny summary judgment "where the evidentiary matter in support of the motion . . . does not establish the absence of a genuine issue of fact." Heath v. John Morrell & Co., 768 F.2d 245, 249 (8th Cir. 1985); see also Cuffley v. Mickes, 208 F.3d 702, 705 (8th Cir. 2000) ("'The party seeking summary judgment must establish the absence of a genuine issue of material fact and his entitlement to judgment as a matter of law.'" (citation omitted)). "'[E]ven if no opposing evidentiary matter is presented,' summary judgment is improper 'if a genuine issue of material fact remains.'" Hugler v. Li Ying Li, 2017 WL 5633299, at *4 (S.D. Iowa Apr. 20, 2017) (citing Heath v. John Morrell & Co., 768 F.2d at 249; Adickes v. Kress & Co., 398 U.S. 144 (1970)). Additionally, if the movant does not fulfill its initial burden of demonstrating a critical element of his or her cause of action, the Court must deny summary judgment even if no opposing evidence is offered. See Adickes, 398 U.S. at 158–61.

When the moving party has met its burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (citing Fed. R. Civ. P. 56).

> In opposing summary judgment, a plaintiff may not "simply point to allegations" in the complaint, Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004), or "rest on the hope of discrediting the movant's evidence at trial," In re Citizens Loan & Sav. Co., 621 F.2d 911, 913 (8th

> Cir. 1980), "but must identify and provide evidence of 'specific facts creating a triable controversy.'" Howard, 363 F.3d at 800 (quoting Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999)).

Robbins v. Becker, 794 F.3d 988, 993 (8th Cir. 2015). "[U]nsupported, self-serving allegations and denials are insufficient to create a genuine issue of material fact." Anuforo v. Comm'r of Internal Revenue, 614 F.3d 799, 807 (8th Cir. 2009) (citations omitted). Likewise, "[c]onclusory assertions and citations to one's own arguments are insufficient to survive summary judgment." Johnson Tr. of Operating Eng'rs. Loc. #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc., 2020 WL 597213, at *5 (8th Cir. Feb. 7, 2020).

The Court views the record in the light most favorable to the nonmoving party and must afford that party all reasonable inferences. Blocker v. Patch (In re Patch), 526 F.3d 1176, 1180 (8th Cir. 2008) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### C. Competing Claims to Pro-Mark's Accounts Receivable, Funds Paid to Pro-Mark for Work Performed on Nonbonded and Bonded Contracts and Insurance Proceeds

The parties assert competing claims to sums owed to or paid to Pro-Mark for work performed on federal contracts.

#### 1. Unpaid Funds Pro-Mark Earned for Work Performed on Bonded and Nonbonded Contracts

Between September 2020 and January 2024, the United States awarded many contracts to Pro-Mark for the performance of various construction-related activities at federal facilities, including Air Force and Space Force bases in Colorado, Nebraska, and North Dakota. Pro-Mark obtained payment and performance bonds from Hartford to secure these contracts as required by the Miller Act, 40 U.S.C. § 3131 et seq. To

memorialize Pro-Mark's agreement to indemnify Hartford for losses it may incur, Pro-Mark and Hartford signed two General Indemnity Agreements, one dated July 14, 2020, and the second dated July 8, 2022. See Bankr. Case No. 24-30167, Doc. 72-1; Doc. 58-3.

On April 22, 2024, the petition date, the Air Force contracts were at various stages of completion, ranging from no performance to substantially complete. According to Bragg, Pro-Mark halted performance on these contracts after the petition date.

As of the petition date, the United States held payments on many of these contracts. According to the United States, it only terminated contracts or remitted payment on fully and partially completed contracts pursuant to Court Orders.

In its Brief in Support of Motion for Summary Judgment, the United States agreed to remit payments on the remaining bonded contracts with outstanding sums due to Pro-Mark as directed by the Court in ruling on the pending summary judgment motions. On the petition date, the United States held approximately $587,707.49 owed to Pro-Mark for work it performed.

On August 15, 2025, Erik Ahlgren, as Trustee of Pro-Mark's estate, filed a Joint Settlement Agreement in which all parties agreed that the United States would remit payments in the sum of $146,831.25 to the bankruptcy estate for work Pro-Mark performed on nonbonded contracts. The Joint Settlement Agreement provided that CCU and Hartford retain any claims they may have against each other, the Trustee, or third parties with respect to the $146,831.25 paid to the Trustee on the nonbonded contracts identified in the Joint Settlement Agreement.

Subtracting the sum paid to the Trustee, the United States is now holding approximately $440,876.24. Hartford asserts that the "remaining $440,876.24 are derived from Air Force Projects bonded by Hartford." Doc. 58 at 28 n.5. The Stipulated Statement of Undisputed Material Facts does not directly support this proposition.

The United States concedes that it owes Pro-Mark $440,876.24 for work performed by Pro-Mark, but the Stipulated Statement of Undisputed Material Facts shows only $128,771.86 is derived from bonded contracts where Hartford paid claims in excess of the sum the United States currently owes to Pro-Mark: $89,273.85 for work Pro-Mark performed on the Offutt AFB – Simulator Contract and $39,409.01 for work completed on the Minot AFB – Windows Task Order. For all other contracts where Hartford paid claims on bonded contracts at issue, the United States does not owe Pro-Mark for the work performed. In other words, there is no documentation linking $312,104.38 ($440,876.24 - $128,771.86) of payments owed to Pro-Mark to reimbursement owed to Hartford for claims it paid. The parties agree, however, that Hartford incurred losses of no less than $1,034,081.31 on Air Force and Space Force contracts that were bonded by Hartford on behalf of Pro-Mark and for the benefit of the Air Force and Space Force. By way of example, Hartford paid a claim for $183,819 for work on the Offutt AFB – Simulator Contract, but the United States only holds $89,273.24 in earned but unpaid contract payments on this project, leaving Hartford with a loss of no less than $94,545.15 on this contract.

The parties also agree that "[i]n total to date, inclusive of the foregoing $1,034,081.34, Hartford has made no less than $3,686,542.42, in performance and

payment bond payments on federal contracts that were bonded by Hartford on behalf of Pro-Mark and for the benefit of the United States Government." Doc. 56 at ¶ 183.

**a. Equitable Subrogation: Unpaid Funds Pro-Mark Earned for Work Performed on Bonded Contracts where Surety's Losses are Greater than the Sum Held**

Hartford argues it is equitably subrogated to Pro-Mark's earned but unpaid contract receivables, and its rights to these funds are superior to those of the bankruptcy estate and CCU. CCU argues that Hartford's right to equitable subrogation is not ripe. It also asserts that any right to equitable subrogation Hartford holds does not entitle it to proceeds from nonbonded contracts or to apply any excess proceeds from one bonded contract to pay a loss on another bonded contract.

Equitable subrogation in the context of this dispute between Pro-Mark, its surety and a lien holder is governed by state law. See Hamada v. Far East Nat'l Bank (In re Hamada), 291 F.3d 645, 651 (9th Cir. 2002); United Specialty Ins. Co. v. Colony Ins. Co., 2024 WL 4004051, at *5 (C.D. Cal. July 1, 2024); Glaspell v. United States (In re Glaspell), 626 B.R. 272, 276 (Bankr. D. W. Va. 2021); In re Brodkey Bros., Inc., 2013 WL 5636484, at *4 (Bankr. D. Neb. Oct. 15, 2013). North Dakota courts have applied equitable subrogation without adopting a specific list of criteria. See, e.g., Am. Nat'l Fire Ins. Co. v. Hughes, 658 N.W.2d 330, 335–34 (N.D. 2005). In Star Ins. Co. v. Cont'l Res., Inc., the United States District Court summarized the principles that apply:

> "Subrogation is an equitable remedy that provides for an adjustment between the parties to secure the ultimate discharge of a debt by the person who, in equity and good conscience, ought to pay for it." St. Paul Fire & Marine Ins. Co. v. Amerada Hess Corp., 275 N.W.2d 304, 308 (N.D. 1979). Equitable subrogation is founded on principles of equity and justice and is intended to protect the rights of one who has paid an obligation which should be imposed on another. State Farm Mut. Ins. Co. v. Wee, 196 N.W.2d 54, 59–60 (N.D.1971); Am. Commercial Lines, Inc. v. Valley Line Co., 529 F.2d

> 921, 924 (8th Cir. 1976). The doctrine permits a party who is not a volunteer or intermeddler to stand in the shoes of another with reference to all lawful claims and rights. BancInsure, Inc. v. BNC Nat. Bank, N.A., 263 F.3d 766, 772–73 (N.D. 2001). Equitable subrogation rests on the principle that no one should be enriched by another's loss. In re Yanke, 230 B.R. 374, 377 (8th Cir. 1999). The doctrine is highly favored and is to be given a liberal application. Id. at 379.

89 F. Supp.3d 1015, 1032 (D.N.D. 2015); see also BancInsure, Inc. v. BNC Nat'l Bank, 263 F.3d 766, 772 (8th Cir. 2001) (applying North Dakota law) ("Equitable subrogation ... is based on the theory that the one invoking it has rightfully discharged debt at the instance and for the benefit of the debtor." (quoting State Farm Mut. Auto. Ins. Co. v. Wee, 196 N.W.2d 54, 59–60 (N.D. 1971))).

Other courts apply a list of five factors derived from In re Leedy Mortg. Co., Inc., 111 B.R. 488, 492 (Bankr. E.D. Pa. 1990), sometimes referred to as the Leedy test. See Photo Mech. Servs., Inc. v. E.I. DuPont De Nemours & Co., Inc. (In re Photo Mech. Servs.), 179 B.R. 604, 618–19 (Bankr. D. Minn. 1995). Under this test, equitable subrogation is appropriate if five factors are present:

> (1) The payment must have been made by the subrogee to protect his own interest;
> (2) The subrogee must not have acted as a volunteer;
> (3) The debt paid must be one for which the subrogee was not primarily liable;
> (4) The entire debt must have been paid; and
> (5) Subrogation must not work any injustice to the rights of others.

Id. at 618; In re Leedy Mortg. Co., 111 B.R. at 492.

In the suretyship context, equitable subrogation is one of a surety's principal mechanisms for reducing loss. Pa. Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff, 354 F.3d 945, 951 (8th Cir. 2004) (citing Prairie State Bank v. United States, 164 U.S. 227, 231 (1986)). "Arising by operation of law, the doctrine permits the surety to acquire and

assert the rights of those parties whom the surety pays." Id. (citation omitted). In other words, the surety is subrogated to the contractor whose obligations are discharged, the owners to whom it was bound, or the subcontractors whom it paid. Dwyer v. The Ins. Co. of the State of Pa. (In re Pihl, Inc.), 560 B.R. 1, 9 (Bankr. D. Mass. 2016) (citations omitted). If the surety completes all contract obligations, "equitable subrogation permits the surety to proceed against retainage and remaining contract funds for reimbursement." City of Pine Bluff, 354 F.3d at 952. This property interest of the surety never becomes a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt. See Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136 (1962); In re J.B. Const. Co., Inc., 2011 WL 830101, at *1–2. This property interest also takes priority over perfected security interests in bonded contract funds. See United Prairie Bank v. Molnau Trucking LLC, 23 N.W.3d 535, 547 (Minn. 2025) ("a performing surety's right to equitable subrogation has priority over a secured creditor as to the bonded contract funds"); In re J.B. Constr. Co., 2011 WL 830101, at 3 (Bankr. D. Neb. Mar. 4, 2011) ("sureties generally prevail over banks with perfected Article 9 security interests") (citation omitted); Kappa Dev. & Gen. Contracting Inc. v. Hanover Ins. Co. (In re Kappa Dev. & Gen. Contracting Inc.), 2019 WL 2867110, at *6 (Bankr. S.D. Miss. Jul. 2, 2019) (a surety's right of equitable subrogation is superior to a secured creditor's rights); Century Ins. Co. v. Guerrero Bros., 2010 WL 997112, at *5 (N. Mar. I. Mar. 17, 2010) ("a creditor who perfected its security interest pursuant to the UCC does not enjoy priority over a surety"); Transamerica Ins. Co. v. Barnett Bank of Marion Cnty., 540 So.2d 113, 117 (Fla. 1989) (surety's equitable subrogation claim had

priority over bank's security interest); Riverview State Bank v. Wentz, 34 F.2d 419, 422 (8th Cir. 1929) (same).

Consistent with the Leedy factors, the Eighth Circuit Court of Appeals clarified that a "prerequisite to equitable subrogation is the surety's full satisfaction of any underlying debt or obligation." City of Pine Bluff, 354 F.3d at 951 (citations omitted); see also Berkley Ins. Co. v. Hawthorn Bank, 2017 WL 4391774, at *4 (Bankr. W.D. Mo. Sep. 29, 2017) (the right of equitable subrogation generally only arises upon total satisfaction of the underlying obligation) (citations omitted). "[W]hen a surety completes work or pays laborers and material suppliers, equitable subrogation permits the surety to proceed against retainage and remaining contract funds for reimbursement." City of Pine Bluff, 354 F.3d at 952 (citing Equilease Corp. v. United States Fid. & Guar. Co., 262 Ark. 689, 565 S.W.2d 125, 126 (1978); Pearlman, 371 U.S. at 139 ("[T]he same equitable rules as to subrogation . . . exist whether a surety completes a contract or whether, though not called upon to complete the contract, it pays the laborers and materialmen.")).

CCU argues that Hartford's right to equitable subrogation of any of the sums held by the United States is not yet enforceable because it has not established full satisfaction of any underlying debt or obligation. CCU highlights statements in the Stipulated Statement of Undisputed Material Facts suggesting that Hartford's surety obligations under some bonded contracts remain unsatisfied.[2] It argues that Hartford

[2] CCU lists four paragraphs in the Undisputed Statement of Material Fact that it claims suggest Hartford has not established full satisfaction of its bond obligations. Two of the four paragraphs relate to contracts where the United States owes no money to Pro-Mark for work it performed, the United States demanded nothing from Hartford related to the completion of these contracts, and the United States terminated the

may not exercise any equitable subrogation rights unless its surety obligations are fully satisfied. CCU's suggestion that Hartford must satisfy all obligations on all of its contracts with the United States while insisting that the Court must evaluate each bond obligation independently for purposes of determining Hartford's equitable subrogation claim is inconsistent and unpersuasive.

The parties stipulated that "Hartford and/or its agents have not performed any work on the Offutt AFB – Simulator Contract post-Petition Date, but are negotiating a takeover agreement with the Air Force." Doc. 56 at ¶ 29. As of March 6, 2026, Hartford had not completed its work on this contract (which is 96.5% complete). Consequently, it has not yet met the prerequisite to equitable subrogation. This conclusion does not mean that either Pro-Mark or CCU are entitled to the earned but unpaid funds held on this bonded contract totaling $89,273.85, however.

Upon completion of the work on this contract, Hartford will have satisfied the prerequisite to equitable subrogation. Hartford satisfied all other factors necessary for equitable subrogation by paying $183,819.00 to a contractor (which is in excess of the sum the United States owes to Pro-Mark on this contract); it paid this claim to protect its own interest under the bond contract; it established that was not acting as a volunteer; and Pro-Mark was primarily liable for completing the contract and paying subcontractors. Granting Hartford the right of equitable subrogation in the context of the Offutt AFB – Simulator Contract will not work an injustice on other parties because Hartford's right to the $89,273.85 is superior to Pro-Mark's or the bankruptcy estate's

---

contracts. The Court does not see the relevance of these contracts to the equitable subrogation analysis.

rights upon default and this right relates back to the time Pro-Mark entered into the suretyship contracts with Hartford. See N.D.C.C. § 22-03-12 ("A surety is entitled to the benefit of every security for the performance of the principal obligation held by the creditor or by a cosurety at the time of entering into the contract of suretyship or acquired by the surety afterwards, whether the surety was aware of the security or not."); United States ex rel Home Indem. Co. v. Am. Emp.s' Ins. Co., 192 F. Supp. 873, 877 (D.N.D. 1961) ("The Home Indemnity rights arising by subrogation relate back to the date of the execution of the performance bond."); City of Pine Bluff, 354 F.3d at 952 (a surety's rights relate back to the time of the bond or contract of suretyship was entered) (citations omitted); In re Jones Const. & Renovation, Inc., 337 B.R. 579, 583 (Bankr. E.D. Va. 2006) (same) (citations omitted). As the court in In re Jones Construction & Renovation explained, there is a

> body of case law that holds when a debtor contractor breaches its contract with a project owner, it precludes debtor's entitlement to retained funds, and thus these funds are not property of the estate. See, e.g., In re Modular Structures, 27 F.3d at 72; In re Pacific Marine, 79 B.R. at 929. The court is less concerned with whether payment has yet been made than with Western Surety's obligation to pay claimants. It is this obligation, brought about by Jones Construction's breach of contract, that makes the doctrine of equitable subrogation applicable. Western Surety is therefore entitled to any funds that may hereafter become due on the CNU project to reimburse it for any losses it has sustained that are not satisfied by the $152,054.93 currently being held. It is also entitled to any remaining contract funds on the Henrico project to reimburse it for any payments it makes under the bond to satisfy the claims on that project. Any remaining contract funds exceeding Western Surety's payments on claims under the bonds are property of the estate and should be turned over to the trustee.

337 B.R. at 585.

Like the In re Jones Construction & Renovation court, this Court finds that Hartford's obligations under the bond arose, and its rights to equitable subrogation

triggered, when Pro-Mark defaulted and relate back to the 2020 and 2022 General Indemnity Agreements between Pro-Mark and Hartford. See id.; Nobel Ins. Co. v. City of New York, 2006 WL 2848121, at *20 (S.D.N.Y. Sep. 29, 2006).[3] Its right to equitable subrogation entitles it to any remaining contract funds on the Offutt AFB – Simulator Contract ($89,273.85) because it paid claims in excess of this sum. These funds are not payable, however, until Hartford satisfies all its obligations under the bonded contract. See City of Pine Bluff, 354 F.3d at 951. To avoid increasing Hartford's risk of undermining its subrogation rights, the United States must hold $89,273.85 or arrange for a deposit in trust until Hartford completes its obligations under the bond.[4]

---

[3] Although Pro-Mark defaulted on or after the petition date, as a matter of equity and public policy, the Court finds that Hartford is entitled to enforce its right to subrogation and resulting equitable lien in unpaid contract proceeds Pro-Mark earned prepetition for work performed on bonded contracts where its losses are greater than contract proceeds. See generally United Pac. Ins. Co. v. Mottner (In re The Massart Co.), 105 B.R. 610, 613 (Bankr. W.D. Wa. 1989); Tri-City Serv. Dist. v. Pac. Marine Dredging & Constr. (In re Pac. Marine Dredging & Constr.), 79 B.R. 924, 929 (Bankr. D. Or. 1987).

[4] This ruling is consistent with City of Pine Bluff which highlighted the general surety law proposition that a creditor must preserve a surety's right of recourse in collateral and the risk to a bond obligee who is on notice of a contract default yet undermines the surety's subrogation rights. See City of Pine Bluff, 354 F.3d at 951; see also N.D.C.C. § 22-03-06 ("A surety is exonerated … to the extent to which the surety is prejudiced by any act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with the surety's rights, or which lessens the surety's security[.]"). In City of Pine Bluff, the Eighth Circuit observed:

> These principles, considered with the equitable rights of laborers and material suppliers (and therefore the subrogated surety) to payment from remaining funds, have led federal courts to recognize the obligee's duty as a "stakeholder" to ensure proper application of collateral (contract funds and retainages) upon appropriate notice of the general contractor's default. See Transamerica, 32 Fed. Cl. at 314; Int'l Fid. Ins. Co. v. United States, 25 Cl.Ct. 469, 477 (1992); Home Indem. Corp., 376 F.2d at 894. Indeed, "the entire doctrine of subrogation in suretyship is dependent upon the immediate investment of the creditor with the obligations of a trustee

Hartford's right to equitable subrogation also entitles it to the $39,498.01 in earned but unpaid contract proceeds from Pro-Mark's work on the Minot AFB – Windows Order. The United States has not demanded that Hartford complete the work remaining on this project. Instead, it partially terminated the contract and "de-obligated as to the amount of work that was not finished." Doc. 56 at ¶ 41. Accordingly, the Court finds that Hartford fully satisfied its obligations under this contract. It is entitled to immediate reimbursement in the sum of $39,498.01, the earned but unpaid funds the United States is holding on this contract.

To the extent the United States is retaining funds on a contract bonded by Hartford where Hartford's losses exceed the sum retained on that contract, Hartford is also entitled to these retained proceeds.

#### b. Equitable Subrogation: Unpaid Funds Pro-Mark Earned for Work Performed on Nonbonded Contracts and Bonded Contracts Where Funds Exceed Surety Losses

Hartford maintains the doctrine of equitable subrogation applies to earned but unpaid contract funds owed to Pro-Mark under both bonded and nonbonded contracts.

---

> whenever any rights or interests of the debtor, applicable to the debt, are placed in his control...." Arthur Adelbert Stearns, The Law of Suretyship § 6.46 (James L. Elder, ed., 5th Ed.1951). If, after appropriate notice of default, the government chooses to pay funds to the general contractor that are or become equitably owed to the surety, the government is liable for the actual loss visited upon the surety.

City of Pine Bluff, 354 F.3d at 953; see also Nobel Ins. Co. v. City of New York, 2006 WL 2848121, at *16 (Bankr. S.D.N.Y. 2006) (citing Pa. Nat. Mut. Cas. Ins. Co., 354 F.3d at 953) ("notice, even in the absence of payment, is sufficient to trigger a right of equitable subrogation")). Accordingly, the surety's obligations under the bond and rights to equitable subrogation arise upon default. Upon notice, it is entitled to reimbursement after it satisfies its obligations under the surety agreement.

While the Court is persuaded that Hartford is entitled to earned but unpaid bonded contract proceeds if their losses equal or exceed these proceeds under the doctrine of equitable subrogation, it is not convinced the same holds true for proceeds of nonbonded contracts.

Hartford argues that under the “common obligee doctrine,” a surety who has suffered a loss on one bonded project from a common owner can assert the project owner’s right to use profit from another project to cover its loss on bonded projects. Employing this doctrine, Hartford argues it is entitled to $146,831.26 in proceeds payable to Pro-Mark under nonbonded contracts, as well as all other earned but unpaid proceeds of contracts between Pro-Mark and the United States.

After Hartford completes all obligations under the bonded contracts, CCU “would not deny” that Hartford is entitled $128,771.86 of the $440,876.24 the United States still holds because this sum is derived from bonded contracts where Hartford paid claims in excess of the sum the United States currently owes to Pro-Mark on those contracts. See Doc. 62 at 17. CCU argues, however, that “Hartford cannot by subrogation obtain payments owing on non-bonded contracts, or apply any excess on a particular bonded contract to a loss on another bonded contract.” Id. In other words, CCU claims that the Court should reject Hartford’s attempt to employ the doctrine of equitable subrogation to support the proposition that it is entitled to more than $128,771.86 of the $440,876.24 held by the United States. It also argues Hartford is not entitled to any of the $146,831.25 paid to the Trustee on the nonbonded contracts. Rather, CCU maintains that these sums are property of the bankruptcy estate subject to CCU’s properly perfected security interest in accounts receivable.

Courts and commentators disagree on whether a surety's equitable subrogation right extends to earned but unpaid contract funds on other projects between the principal and the obligee. Hartford cites four cases in which courts ruled that a surety was entitled to nonbonded contract receivables or proceeds from other contracts between the surety, oblige and principal.

In Travelers Casualty & Surety Company of America v. Paderta, 2013 WL 3388739 at *2 (N.D. Ill. Jul. 8, 2013), the surety paid losses arising from both bonded and nonbonded contracts. The equities favored equitable subrogation in Travelers.

In District of Columbia v. Aetna Insurance Company, 462 A.2d 428 (D.C. 1983), the only claimants to the earned but unpaid contract funds were the surety and the contractor. The court observed:

> The more fundamental analysis of the right of subrogation, however, is equitable in nature and allows the surety to be viewed as the owner because he has met the responsibilities of a defaulting contractor to the owner. Fairness would dictate that the surety be accorded the owner's rights and remedies with respect to the contractor. In circumstances, like the present, where the same contractor is engaged in more than one project, it becomes clearer that it is the reach or scope of the remedy rather than the equitable right itself which is at issue.

D.C. v. Aetna Ins. Co., 462 A.2d at 431. Consequently, the District of Columbia court adopted the view that "[t]he right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties." Id. (citations omitted); see also State Farm Mut. Auto. Ins. Co. v. Wee, 196 N.W.2d 54, 59–60 (N.D. 1971) ("Equitable subrogation is founded upon principles of equity and justice, intended to afford protection of the rights of a creditor.… The doctrine of subrogation will be applied only in equitable discretion.") (citations omitted).

Like the circumstances discussed in District of Columbia, no interests other than the surety and the defaulting contractor claimed the contract proceeds at issue in Transamerica Ins. Co v. United States, 989 F.2d 1188 (Fed. Cir. 1993). The Transamerica court ruled, "On the facts of this case, when there are no government claims to be counterbalanced, it would be against fairness and good conscience to allow the defaulting contractor to benefit, through the government's error, at the expense of the fully performing surety." 989 F.2d at 1195. Similarly, in Kentucky Central Insurance Co. v. Brown (In re Larbar Corp.), 177 F.3d 439, 447 (6th Cir. 1999), the court allowed setoff against the proceeds of multiple contracts, noting that there were no third party secured creditors whose legal rights would be impaired by enforcing the surety's right to equitable subrogation and setoff under 11 U.S.C. § 553.

Like the District of Columbia court and the North Dakota Supreme Court in Wee, this Court recognizes the equitable nature of the equitable subrogation remedy, but it is not convinced that employing the common obligee doctrine under the circumstances of this case is equitable. Unlike the cases Hartford cites, allowing Hartford the right to proceeds of nonbonded contracts or contract proceeds in excess of the claims Hartford paid on specific contracts impairs both CCU and the bankruptcy estate. The balance of equities in this case favors granting Hartford the right of equitable subrogation to the extent bonded contract proceeds are sufficient to pay its losses. Bonded contract proceeds in excess of Hartford's losses on any particular contract are property of the bankruptcy estate unless assigned under the General Indemnity Agreement or subject to a security interest. See W. Cas. & Sur. Co. v. Brooks (In re Bruns Coal Co.), 362 F.2d 486, 491 (4th Cir. 1966) ("The doctrine of subrogation arises out of the unpaid

debts on each contract; relates back in time to the execution of that specific bond; and is limited in scope to the debts arising under one contract."); Liberty Mut. Ins. Co. v. SBN V FNBC LLC, 2019 WL 346707, at *3-4 (E.D.N.C. Jan. 28, 2019) (concluding that each bonded project must be treated separately and a surety cannot use surplus funds from one project to defray losses taken on other projects, even if the projects have common owners; to the extent that there were excess receivables on any particular project, the secured party was entitled to them; a surety is entitled to receivables and contract funds on a particular bonded project up to the amount of its net loss on that project); Intercargo Ins. Co. v. United States, 41 Fed. Cl. 449, 457 (Fed. Cl. 1998) (noting that "the surety's right to subrogation arises only as to the monies due under the contract in question") (citation omitted). Likewise, sums owed under nonbonded contracts are property of the bankruptcy estate unless assigned under the General Indemnity Agreement or subject to a security interest. See generally In re Bruns Coal Co., 362 F.2d at 491. Finally, the Court is unwilling to recognize an equitable lien in these funds outside the context of equitable subrogation for the reasons discussed above.

**c. Assignment: Unpaid Sums Pro-Mark Earned for Work Performed on Bonded and Nonbonded Contracts**

Under the terms of the General Indemnity Agreements, Pro-Mark assigned all its rights "arising from, or related to Bonds or any bonded or nonbonded contracts, subcontracts and subcontract bonds and any extensions, modifications, alterations and additions" to Hartford. Bankr. Case No. 24-30167, 72-1 at ¶ 9(a); Doc. 58-3 at ¶9(a). Pro-Mark also assigned "[a]ll right, title and interest of the Indemnitors in and to; (1) work performed on any Bonded or unbonded contract[.]" Bankr. Case No. 24-30167,

72-1 at ¶ 9(b); Doc. 58-3 at ¶ 9(b). Additionally, Pro-Mark assigned "[a]ny and all accounts receivable, … deferred payments, refunds, retainage or retainage account in which the Indemnitors have an interest." Bankr. Case No. 24-30167, Doc. 72-1 at ¶ 9(d); Doc. 58-3 at ¶ 9(d). Upon Pro-Mark's default, Hartford maintains the agreement granted it the absolute right to enforce this assignment.

Hartford contends that these assignment provisions in the General Indemnity Agreement conferred upon Hartford contractual rights that created an interest in the proceeds of bonded contract funds. It is not clear from Hartford's pleadings or arguments whether Hartford claims an assignment under general property or contract law or an assignment intended as security. The General Indemnity Agreement purports to be a security interest (Bankr. Case No. 24-30167, Doc. 72-1 at ¶ 20; Doc. 58-3 at ¶ 20), and Hartford refers to the assignment in the Intercreditor Collateral Agreement as a "lien," but Hartford claims the assignment is governed by contract law, not the Uniform Commercial Code as adopted by North Dakota.

As the Eighth Circuit Court of Appeals explained,

> Often, the law will attach a different meaning to the same word depending upon the area of law in which it is being used. For example, an offer for purposes of § 5 of the Securities Act of 1933 may or may not be an offer under general contract law. Similarly, an assignment for purposes of Article 9 may or may not be an assignment under general property law. An assignment has traditionally been defined in the law of contracts as a transfer by the assignor of all rights in the property assigned to the assignee. It effects an absolute and irrevocable transfer of ownership. Article 9, which governs secured transactions, uses the term assignment, but under Article 9 it does not always mean a complete and absolute transfer of ownership. See Texas Bus. & Com.Code Ann. § 9.102(b) (states that Article 9 applies to security interests created by contract, including an assignment). Indeed, Article 9's primary purpose is to regulate security agreements, not transfers or sales, which are governed primarily by Article 2. When an assignment is intended for purposes of security, which § 9.102 permits, it is subject to Article 9.

Artoc Bank & Trust v. Apex Oil Co. (In re Apex Oil Co.), 975 F.2d 1365, 1369 (8th Cir. 1992), reh'g denied and opinion modified (Nov. 19, 1992).

Hartford avoids the characterization of the General Indemnity Agreement as a security interest, apparently concerned about the attachment and perfection requirements under the Uniform Commercial Code as adopted by North Dakota. To prevail on its claim that the assignment in the General Indemnity Agreement transferred ownership in contracts, accounts receivable and retainage, Hartford must show Pro-Mark intended to transfer and retain no control over the funds with no authority to collect and no power to revoke. See Armstrong v. United States (In re Bagley), 1988 WL 1015997, at *2 (Bankr. D.N.D. Mar. 4, 1988) (analyzing whether an assignment absolutely conveyed all of a debtor's right to payments or whether the parties intended the assignment to serve as security); Cascades Dev. of Minn., LLC v. Nat'l Specialty Ins., 675 F.3d 1095, 1098–99 (8th Cir. 2012) ("Under Minnesota law, no particular form of words is required for an assignment, but the assignor must manifest an intent to transfer and must not retain any control or any power of revocation.") (citations omitted); Broadcast Music, Inc. v. Hirsch, 104 F.3d 1163, 1167 (9th Cir. 1997) ("Under New York law, 'an assignment occurs only where the assignor retains no control over the funds, no authority to collect and no power to revoke.'") (citation omitted); Banque Arabe et Int'l D'Investissement v. Bulk Oil (USA) Inc., 726 F.Supp. 1411, 1417 (S.D.N.Y. 1989) (same); Restatement (Second) of Contracts § 317(a) (1981).

Facts offered in support of Hartford's Motion for Summary Judgment show Pro-Mark executed two General Indemnity Agreements in favor of Hartford as partial

consideration for Hartford's execution of bonds and other consideration. Pro-Mark needed the bonds for government contracts and agreed to convey rights in consideration for the bonds. Pro-Mark's signature suggests intent to convey rights at the time it signed the General Indemnity Agreements, but Pro-Mark's obligation to transfer ownership of assets under the agreement is not triggered until default[5] and any collateral or collateral proceeds in excess of Hartford's losses must be returned to Pro-Mark under the terms of the agreements.[6] Consequently, Pro-Mark's intent to immediately convey ownership of the assets assigned is suspect.[7] There is no evidence that Hartford demanded immediate conveyance of contract proceeds or that Pro-Mark intended to convey all bonded contract proceeds on the date they signed the General Indemnity Agreements.[8] Similarly, there is no evidence that Hartford demanded any collateral under the assignment provisions until after Pro-Mark defaulted.

[5] See Bankr. Case No. 24-30167, Doc. 72-1 at ¶ 10 ("Upon Default, Hartford shall have the absolute right to take any or all of the following actions: (a) Assert, enforce, and use all the assigned, transferred or conveyed rights;"); Doc. 58-3.

[6] See, e.g., Bankr. Case No. 24-30167, 72-1 at ¶ 6; Doc. 58-3.

[7] See Nw. Elec. Co of Ohio v. A.P. O'Horo Co. (In re Nw. Elec. Co. of Ohio), 84 B.R. 400, 402 (Bankr. W.D. Pa. 1988) ("The contention of the defendants that they became the outright owners of the account is also disregarded since the plain terms of the assignment agreements state that the assignments are only valid to the extent of the claim of the subcontractor against Northwest even though both assignments are otherwise blanket assignments of the entire claim of Northwest against the owner. It is quite clear and we find that the assignments were for security purposes.").

[8] See Moon v. Big R Sand & Gravel, Inc. (In re Ellison), 245 B.R. 361, 364 (Bankr. W.D. Mo. 1999) ("An assignment is valid if the circumstances evidence a clear present intention on one side to assign and on the other side to receive. A mere agreement to assign a debt at some future time does not operate as an assignment and does not vest any interest in the assignee.") (footnotes omitted).

Conversely, there is evidence suggesting the parties intended the collateral assigned to serve as security for any losses Hartford incurs. Paragraph 20 of the General Indemnity Agreement provides that the "Agreement constitutes a Security Agreement in favor of Hartford." Bankr. Case No. 24-30167, Doc. 72-1; Doc. 58-3. The language in and purpose of the General Indemnity Agreement and the parties' course of conduct show the parties intended the assignment provision to be security for any loss Hartford incurred. See In re Apex Oil Co., 975 F.2d at 1369. The Court finds that the parties to the General Indemnity Agreement intended the assignment to serve as security, and the agreement is evidence of a security interest in the collateral assigned.

The record also shows that Pro-Mark granted Hartford a security interest that attached under North Dakota law. N.D.C.C. § 41-09-13 outlines the attachment requirements and provides, in relevant part:

> 1. A security interest attaches to collateral when the security interest becomes enforceable against the debtor with respect to the collateral,
>
> 2. Except as otherwise provided in subsections 3 through 9, a security interest is enforceable against the debtor and third parties with respect to the collateral only if:
>
>    a. Value has been given;
>
>    b. The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
>
>    c. One of the following conditions is met:
>
>       (1) The debtor has signed a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned;
>
> * * *
>
>       (6) The attachment of a security interest in collateral gives the secured party the rights to proceeds provided by section 41-09-35 and is also attachment of a security interest in a supporting obligation for the collateral.

N.D.C.C. § 41-09-13; see PHI Fin. Servs., 874 N.W.2d at 919.

As partial consideration for Hartford's execution of bonds and other consideration, Pro-Mark signed two General Indemnity Agreements in favor of Hartford, dated July 14, 2020, and July 8, 2022. Berg Aff. ¶ 4. Hartford provided the bonds Pro-Mark needed in consideration for the security provided in the General Indemnity Agreements.[9] Pro-Mark held prepetition rights to payments under the contracts it entered with the United States, and Pro-Mark signed the General Indemnity Agreement purporting to be a security agreement creating a security interest in favor of Hartford.

The General Indemnity Agreement also satisfies the last requirement, a description that reasonably identifies the collateral. Under N.D.C.C. § 41-09-08(1), a description of the collateral in a security agreement is sufficient "regardless of whether the description is specific, if the description reasonably identifies what is described." Section 41-09-08(2) provides, in relevant part:

> [A] description of collateral reasonably identifies the collateral if it identifies the collateral by:
>
> a. Specific listing;
>
> b. Category;
>
> c. Except as otherwise provided in subsection 5, a type of collateral defined in the Uniform Commercial Code;
>
> d. Quantity;
>
> e. Computational or allocational formula or procedure; or

[9] See Doc. 58-1; N.D.C.C. § 41-01-12 ("a person gives value . . . [i]n return for any consideration sufficient to support a simple contract."); Thompson v. Danner, 507 N.W.2d 550, 555 (N.D. 1993) ("The Bank gave value in the form of a renewal of a prior operating loan plus additional operating funds for the 1990 crop year.").

> f. Except as otherwise provided in subsection 3, any other method, if the identity of the collateral is objectively determinable.

N.D.C.C. § 41-09-08(2); see also Royal Jewelers Inc. v. Light, 859 N.W.2d 921, 927 (N.D. 2015). Subsection 9(a) of the General Indemnity Agreement grants Hartford an interest in "All rights of the Indemnitors in, arising from, or related to Bonds or any bonded or unbonded contracts[.]" Bankr. Case No. 24-30167, Doc. 72-1; Doc. 58-3. Similarly, subsection 9(b) of the General Indemnity Agreement grants an interest to Hartford in "All right, title and interest of the Indemnitors in and to; (1) the work performed on any Bonded or unbonded contract; [.]" Id. Additionally, subsection 9(d) grants to Hartford an interest in:

> Any and all accounts receivable, accounts, chattel paper, documents of title, intangibles, claims, judgments, choses in action, purchaser orders, bills of lading, federal or state tax refunds, tort claims, premiums, deferred payments, refunds, retainage or retainage account in which the Indemnitors have an interest.

Id. In light of the references to bonded and nonbonded contracts, work performed on these contracts and accounts receivable, the Court finds that the assignment provision in the General Indemnity Agreement sufficiently describes the earned but unpaid funds the United States is holding under bonded contracts.

In its objection to the Court's Provisional Memorandum and Order, CCU argued that the language in the General Indemnity Agreement was insufficient to create a security interest in bonded contract receivables and their proceeds because the agreement did not include an after-acquired property clause.[10] The stipulated facts

[10] During oral argument at the hearing on CCU's Motion for Relief from the Automatic Stay, CCU argued that the language in the General Indemnity Agreement was insufficient to create a security interest in bonded contract receivables and their proceeds because the agreement did not include an after-acquired property clause. At

confirm that the United States and Pro-Mark entered into many of the bonded contracts at issue after the parties executed the General Indemnity Agreements in 2020 and 2022. Accordingly, the question is whether Hartford's security interest attached to contracts entered after 2022 and the accounts receivable due to Pro-Mark arising from them.

Under North Dakota law, "a security agreement may create or provide for a security interest in after-acquired property." N.D.C.C. § 41-09-14; Horob v. Farm Credit Servs. of N.D. ACA, 777 N.W.2d 611, 615 (N.D. 2010). Neither the statute nor North Dakota case law requires specific language to create an interest in after-acquired collateral. Because accounts (including accounts receivable) are self-liquidating and cyclical, many courts have concluded that using the word "accounts" is sufficient to include presently existing and after-acquired accounts. See ARA Inc. v. City of Glendale, 2018 WL 1411787, at *2 (D. Ariz. Mar. 21, 2018) (citing a Minnesota practice guide that notes that a majority of courts hold that the mere use of the word 'inventory' or 'accounts' was sufficient to cover presently existing and after-acquired inventory and accounts); Paulman v. Gateway Venture Partners III (In re Filtercorp, Inc.), 163 F.3d 570, 579 (9th Cir. 1998) ("we find more persuasive the contrary position, adopted by the majority of jurisdictions, that a security interest in inventory or accounts receivables presumptively includes an interest in after-acquired inventory or accounts receivables, respectively.") (citations omitted); Claytor v. Shenandoah Warehouse Co. (In re Shenandoah Warehouse Co.), 202 B.R. 871, 875 (Bankr. W.D. Va. 1996) ("The

the time of the hearing, neither party cited the cases standing for the proposition that a security interest in accounts receivables presumptively includes an interest in after-acquired accounts receivables, and the Court was unaware of them.

commercially reasonable interpretation of the phrase 'accounts receivable' in a security agreement is that it includes all receivables existing as of the date of the security agreement and after-acquired receivables generated during the life of the security agreement.").

Importantly, "the majority of courts and commentators reason that the presumption of a floating lien on inventory and accounts receivable is not created by particular language but rather springs from an appreciation of the cyclical nature of the collateral itself." In re Filtercorp, Inc., 163 F.3d at 580. Based on this premise—which the Court adopts[11]—the assignment language in the General Indemnity Agreement providing Hartford and interest in all "accounts" and "accounts receivable" sufficiently describes the earned but unpaid bonded contract funds held by the United States to create a presumption that Hartford holds a security interest in accounts receivable, even if the funds were derived from contracts Pro-Mark received after 2022.

The language in the General Indemnity Agreement supports this interpretation.[12] The collateral description in the assignment provision includes broad terms like "all

[11] The Court adopts this premise because it believes the North Dakota Supreme Court would hold that security interests in accounts receivable presumptively include after-acquired receivables, subject to rebuttal evidence that the parties intended otherwise.

[12] As the North Dakota Supreme Court explained:

> Determining what obligations are secured by the collateral listed in a security agreement is a "matter of construing the parties' agreement under applicable law." Unif. Commercial Code § 9–204 cmt. 5, 3 U.L.A. 136. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." N.D.C.C. § 9–07–02. We have stated:
>
> > "Written contracts are construed to give effect to the parties' mutual intention when the contract was formed, and if possible, we look to the writing alone to determine the parties'

rights of the Indemnitors in, arising from, or related to Bonds or any bonded or unbonded contracts," and "any and all accounts receivable, accounts[.]" Bankr. Case No. 24-30167, Doc. 72-1; Doc. 58-3 at ¶ 9. The "Application of the Agreement" paragraph provides that the agreement shall apply to "all Bonds Underwritten by Hartford, whether prior to, simultaneously with, or subsequent to this Agreement's execution[.]" Doc. 58-3 at ¶ 2. The provision reinforces the proposition that "Hartford shall have the absolute right to apply any amount owed to any Indemnitor against the amount owed by that Indemnitor to Hartford." Id. This language supports Pro-Mark's and Hartford's intent to include accounts receivable arising from all contracts Hartford bonded as security for any obligations Pro-Mark may owe Hartford. CCU produced no evidence rebutting this presumption. Accordingly, Hartford holds a security interest that attached to earned but unpaid bonded contract funds/accounts receivable existing as of the date of the General Indemnity Agreement and after-acquired receivables generated during the life of the agreement.

---

> intent. The interpretation of a written contract is a question of law, if the parties' intent can be determined from the language of the writing alone. Whether a written contract is ambiguous is a question of law, which we review independently. A written contract is ambiguous if rational arguments can be made for different interpretations. If a written contract is ambiguous, extrinsic evidence may be considered to determine the parties' intent, and the terms of the contract and the parties' intent are questions of fact. If a written contract is unambiguous, however, extrinsic evidence is not admissible to contradict the written language."

Horob, 777 N.W.2d at 615–16 (quoting Doeden v. Stubstad, 755 N.W.2d 859, 864–65 (N.D. 2008) (citations omitted)).

"While 'attachment' relates to the creation and enforceability of a security interest between the parties to the transaction, 'perfection' is an additional step which makes the security interest effective against third parties." PHI Fin. Servs., Inc. v. Johnston Law Office, P.C., 874 N.W.2d 910, 919 (N.D. 2016) (quoting Thompson v. Danner, 507 N.W.2d 550, 554 (N.D. 1993)). Although there is no evidence that Hartford perfected its security interest in the assigned right to contracts, accounts receivable and retainage in the possession of the United States, this status does not impair Hartford's right to earned but unpaid bonded contract funds because the Intercreditor Collateral Agreement grants it priority to this collateral as between CCU and Hartford. Hartford's security interest in bonded contract funds is a lien under the Intercreditor Collateral Agreement. Bankr. Case 24-30167, Doc. 72-4 at Covenants ¶ 2; see also 11 U.S.C. § 101(51A) ("The term 'security interest' means lien created by an agreement."). Under the Intercreditor Collateral Agreement, Hartford's liens in Surety Priority Collateral are senior and superior to CCU's liens, regardless of the relative times of attachment or perfection. Surety Priority Collateral includes Bonded Contracts and the proceeds of these contracts. Accordingly, Hartford's claim to $440,876.24 held by the United States, less nonbonded contract proceeds, is senior and superior to CCU's liens.[13] Hartford's claim to these funds is also superior to the bankruptcy estate.[14]

---

[13] As noted above, there is no documentation linking $312,104.38 ($440,876.24 - $128,771.86) of payments owed to Pro-Mark to reimbursement owed to Hartford for claims it paid. There is a question of fact regarding whether these funds are retainage on contracts where Hartford suffered losses, retainage on nonbonded contracts or some other characterization.

[14] The Trustee's opportunity to avoid Hartford's security interest expired. See 11 U.S.C. § 546(a)(1). Even if the Trustee had pursued lien avoidance, it is unlikely he would have prevailed. See Three Rivers Bank of Mont. v. N. End Timber Prods., LLC

The definition of Surety Priority Collateral in the Intercreditor Collateral Agreement includes no reference to nonbonded contracts or receivables. Accordingly, the $146,831.25 held by the bankruptcy estate for work Pro-Mark performed on nonbonded contracts may be disbursed according to Bankruptcy Code priorities.

**2. Funds Pro-Mark Deposited in its Accounts with CCU**

On the petition date, Pro-Mark held two deposit accounts with CCU: the S-1 account, a savings account, and S-12, a business account.

Pro-Mark "received $1,900,000 arising from a settlement with Atlantic Specialty Insurance Company on July 18, 2023, arising out of a claim related to a Directors and Officers' Insurance Policy asserting a failure by said insurance company to defend Debtor with respect to a criminal investigation." Doc. 56 at ¶ 18. Pro-Mark deposited these funds in Pro-Mark's S-1 Deposit Account. Id.

The S-1 Deposit Account received three transfers from Pro-Mark's S-12 Deposit Account in the sum of $284,434.88 each on January 15, 2024, February 15, 2024, and March 15, 2024, totaling $853,304.64. Pro-Mark made these transfers in accordance with the terms of the Amendment to Modification Agreement dated January 12, 2024.

From January 2024 to April 2024, Pro-Mark received 28 deposits in its S-12 Account for work Pro-Mark performed on government projects. Doc. 56 at ¶ 20. These deposits total $3,047,276.36.

Pro-Mark petitioned for bankruptcy relief on April 22, 2024.

---

(In re N. End Timber Prods., LLC), 2007 WL 4468706 at *9–*10 (Bankr. D. Mont. Dec. 17, 2007); Robinson v. Howard Bank (In re Kors, Inc.), 64 B.R. 163, 169–70 (D. Vt. 1986), aff'd, 819 F.2d 19, 23-24 (2d Cir. 1987); Betta Prods., Inc. v. DS-MAX Mgmt., Inc. (In re Betta Prods., Inc.), 2003 WL 22945664, at *1 (Bankr. N.D. Cal. July 7, 2003).

As of May 17, 2024, Pro-Mark maintained $3,306,470.14 in its Deposit Accounts held at CCU. Doc. 56 at ¶ 21. S-1 held $2,754.143.98, and S-12 held $552,326.16.

On May 17, 2024, S-1 may have included proceeds from the settlement discussed above. Pro-Mark obtained a payment and performance bond from Hartford on some of the projects it performed for the United States. Payments made for work on these bonded contracts were deposited in Pro-Mark's S-12 account and may have comprised some of the money held in S-1 and S-12 on May 17, 2024. See Doc. 56 at ¶ 20.

On August 2, 2024, the Court granted CCU relief from the automatic stay to set off the funds in these accounts. Currently, there is $0.00 in the S-12 Account, and $0.00 in the S-1 Account due to CCU's setoff.

**a. Funds Deposited in Pro-Mark's Deposit Accounts Were Not Subject to Equitable Subrogation or Assignment that Created an Ownership Interest**

Unlike the discussion of the parties' rights to funds held by the United States or the Trustee, Hartford's right to equitable subrogation does not apply to payments the United States made to Pro-Mark and Pro-Mark deposited before Pro-Mark defaulted or failed to perform. See Int'l Fid. Ins. Co. v. United States, 949 F.2d 1042, 1046 (8th Cir. 1991) (reciting Missouri's general rule "that when sums earned under the contract are paid generally to the contractor, such funds are thereby freed of any equity or right of subrogation in the surety," and ruling that the surety's right to unpaid progress payments arise after the contractor defaulted); City of Pine Bluff, 354 F.3d at 952 ("Thus, if the City were still holding retainage or contract funds, extant Arkansas law would provide for Penn National's reimbursement, and Penn National would be entitled to priority over

[the contractor] and [the contractor's] creditors."); Arch Ins. Co. v. FVCbank, 881 S.E.2d 785, 794 (Va. 2022) ("[A]ny equitable interest [the surety] had in [the debtor's] deposit account funds was destroyed when the funds were deposited in a general deposit account, and [the debtor] and the bank never agreed to create a trust account."); Berkley Ins. Co., 2018 WL 1516885, at *3 ("The right of subrogation attaches only to 'all funds, earned but unpaid progress payments, as well as contract retainages, in the hands of contractee at the time of default.'") (applying Missouri law); In re Union City Contractors, Inc., 2010 WL 1226882, at *9 (Bankr. W.D.N.Y. Mar. 31, 2010) (agreeing "with the Eighth Circuit Court of Appeals in International Fidelity that, sums, fully earned and paid-out are free of any superior equitable interest or right of subrogation in a surety, in order to promote the free flow of commerce, and in order to insure that parties that receive such progress funds from a contractor do not have to be concerned with potential future claims for the return of the money.").

For the reasons provided above, the assignment language in the General Indemnity Agreement did not assign an ownership interest in bonded or nonbonded contract proceeds deposited in Pro-Mark's accounts with CCU because: (1) the Court is not convinced that the assignment provision transferred ownership interest in these funds; (2) the default triggering Hartford's right to an assignment did not occur until after the United States transferred the funds to Pro-Mark; and (3) there is no evidence in the record that Hartford gave the United States notice of its assigned rights or demanded enforcement of the right conveyed.

Consequently, to resolve the dispute over funds deposited in Pro-Mark's accounts, the Court looks to the General Indemnity Agreement between Pro-Mark and

Hartford and the Intercreditor Collateral Agreement, which established the relative priorities of Hartford and CCU and their respective rights to Pro-Mark's assets.

**b. The $1,900,000 in Settlement Proceeds Are Not Surety Priority Collateral Under the Intercreditor Collateral Agreement**

Hartford argues that the $1,900,000 in settlement proceeds Pro-Mark received from Atlantic Specialty Insurance Company on July 18, 2023, is collateral assigned to it under the General Indemnity Agreement between Pro-Mark and Hartford executed in July 2020 and 2022. Paragraph 9(c) provides that Pro-Mark assigned "all rights arising out of insurance policies in which any Indemnitor has an interest[.]" Bankr. Case No. 24-30167, Doc. 72-1 at ¶ 9(c); Doc. 58-3. Under the Indemnity Agreement, the insurance rights assignment to Hartford was not triggered until one of the default events occurred. See In re Pihl, 560 B.R. at 12–14. Failure to perform under paragraph 1(b)(i) or the commencement of insolvency proceedings under paragraph 1(b)(i) both occurred on April 22, 2024. Until then, Hartford held no claim to "rights arising out of insurance policies in which Pro-Mark had an interest." Pro-Mark received the insurance proceeds more than nine months before Hartford's rights under the assignment vested. By then, Pro-Mark deposited the funds.

To the extent Hartford argues that the General Indemnity Agreement is a security agreement granting a security interest in insurance proceeds, Hartford's interest did not attach to the $1,900,000 in settlement proceeds that Pro-Mark received in 2023, months after the parties signed the 2022 General Indemnity Agreement, because the language in this agreement does not reasonably identify or sufficiently describe a security interest in after-acquired insurance proceeds. Unlike accounts, there is no presumption of a

floating lien applicable to insurance proceeds. The Court declines to find, as a matter of law, that Hartford's security interest in insurance proceeds attached to the $1,900,000 in settlement proceeds. There is also no evidence that Hartford perfected any claimed security interest in the settlement proceeds.

Even if Hartford had demonstrated a claim or security interest in the insurance proceeds, its purported right to this collateral is not senior and superior to CCU's security interest under the Intercreditor Collateral Agreement.

In the Intercreditor Collateral Agreement, CCU and Hartford agreed that:

> Regardless of the relative times of the attachment or perfection of Liens or the order of filing of security agreements, financing statements, or other documents, the Liens of [Hartford] in the Surety Priority Collateral shall in all respect be senior and superior to the Liens of [CCU] in the Surety Priority Collateral.

Bankr. Case No. 24-30167, Doc. 72-4, Covenants ¶ 4; Doc. 56 at ¶ 17. Under this agreement, Surety Priority Collateral is defined as "all Bonded Contracts, Bonded Intangibles, Bonded Receivables including affirmative claims, Bonded Records, Bonded Intellectual Property, Bonded Working Assets and all Proceeds thereof." Id. at Doc. 72-4, Covenants ¶ 2. Hartford does not argue that proceeds of a settlement arising out of a claim related to a Directors and Officers' Insurance Policy asserting a failure by the insurance company to defend Pro-Mark during a criminal investigation are Bonded Contracts, Bonded Receivables, Bonded Records, Bonded Intellectual Property, Bonded Working Assets and all Proceeds thereof. Instead, Hartford argues that the settlement proceeds fall within the definition of Bonded Intangibles.

In the Intercreditor Agreement, "Bonded Intangible" is defined, in relevant part, as:

> all rights, actions causes of action, claims and demands of [Pro-Mark] in, or arising from or out of: . . . (iii) any and all payments under insurance (whether or not [Hartford] is the loss payee), or any indemnity warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to Surety Priority Collateral.

Id. at Doc. 72-4, Covenants ¶ 2.

Section 9-07-02, N.D.C.C., provides, "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." Further, under N.D.C.C. § 9-07-12, "A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." Given the plain language of the contractual provision in the context of an Intercreditor Collateral Agreement where the Surety's collateral relates to bonded contracts with Pro-Mark, an insurance payment is only a "Bonded Intangible" if "payable by reason of loss or damage to or otherwise with respect to Surety Priority Collateral." Although "or otherwise" is broad, that phrase immediately follows "loss or damage to." The terms "loss or damage to" modify "or otherwise" to only include similar things. See N.D.C.C. § 9-07-13 ("However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."). A payment made by an insurance company as a settlement of a claim against it for failing to defend corporate officers is not of the same type or nature as a payment made due to loss or damage to equipment or other Surety Priority Collateral.

Accordingly, the Court finds that the settlement proceeds are not Surety Priority Collateral. To the extent these proceeds are traceable to Pro-Mark's S-1 account and set off by CCU in August 2024, Hartford did not offer sufficient evidence to show that CCU breached the Intercreditor Collateral Agreement by doing so.

**c. Funds Pro-Mark Received for Work on Bonded Federal Construction Contracts that It Deposited in CCU Accounts May Be Surety Priority Collateral**

Hartford argues it is entitled to summary judgment on its breach of contract claim against CCU because CCU breached the Intercreditor Collateral Agreement by failing to deliver "Surety Priority Collateral" to Hartford, and by setting off "Surety Priority Collateral" and applying it to debt that Pro-Mark owed to CCU. More specifically, Hartford claims that CCU wrongfully set off $3,306,470.14 in deposit accounts because all or part of this money is traceable to proceeds from bonded contracts, which Hartford claims is Surety Priority Collateral.

**i. Hartford Failed to Show That, As a Matter of Law, the Provisions of the General Indemnity Agreement Created a Valid Trust Under North Dakota Law**

Hartford argues that the trust provision in the General Indemnity Agreement independently establishes that bonded contract funds deposited into Pro-Mark's account were held in trust for Hartford, giving Hartford a direct and enforceable interest in those funds. It maintains that, by offsetting these funds, CCU breached the Intercreditor Collateral Agreement.

To meet its burden of showing that the General Indemnity Agreement created an enforceable trust under North Dakota law, Hartford must show Pro-Mark had the capacity to create a trust, intention to create the trust, listed a beneficiary, and the trustee has duties to perform. See N.D.C.C. § 59-12-02. Hartford failed to show, as a matter of law, that Pro-Mark intended to create a trust.

The only evidence Hartford offered in support of its argument is the General Indemnity Agreement, which includes trust language. The Stipulated Statement of

Undisputed Material Facts and bank statements filed as exhibits to Hartford's Motion for Summary Judgment show Pro-Mark deposited contract proceeds into an account from which it paid payroll and other routine expenses. It did not deposit bonded contract proceeds in a separate account which would suggest the creation of the trust. Pro-Mark and Hartford worked together on bonded contract related matters since 2020, yet there is no evidence that Pro-Mark honored this trust provision or that Hartford demanded it. The trust language in the General Indemnity Agreement, without any evidence of restrictions on the use of funds, is not sufficient as a matter of law to show an intention to create a trust. See Guarantee Co. of N. Am. USA v. Associated Bank, 2019 WL 4897171, at *4 (D. Minn. Aug. 27, 2019); Shapiro v. Jacob's Elec. Constr., Inc. (In re E. Concrete Paving Co.), 293 B.R. 704, 710 (Bankr. E.D. Mich. 2003) ("A provision contained in an indemnity agreement between the surety and contractor purporting to create a trust, without any evidence of the intention of the settlor to create a trust or impose restrictions on the use of the funds by the purported trustee, is insufficient by itself to create an enforceable express trust."); Acuity v. Planters Bank, Inc., 362 F.Supp.2d 885, 892 (W.D. Ky. 2005) (finding under Kentucky law that a "settlor and trustee must take some action to create a trust by declaration . . . to agree to do so at some future time, unaccompanied by later action or evidence of intent to create a trust, is not enough").

**ii. Hartford Holds a Security Interest in Bonded Contract Receivables and Their Proceeds**

As discussed in detail above, Hartford holds a security interest that attached to earned but unpaid bonded contract funds/accounts receivable existing as of the date of the General Indemnity Agreement and after-acquired receivables generated during the

life of the agreement. The question is whether this security interest attaches to proceeds of bonded contract receivables after Pro-Mark deposited them in its accounts with CCU. Under North Dakota law, the answer is "yes" if the proceeds are identifiable.

Section 41-09-13 of the North Dakota Century Codes outlines security interest attachment requirements. Subsection 6 of this statute provides:

> The attachment of a security interest in collateral gives the secured party the rights to proceeds provided by section 41-09-35 and is also attachment of a security interest in a supporting obligation for the collateral.

N.D.C.C. § 41-09-13(6). Section 41-09-35, in turn, provides:

> 1. Except as otherwise provided in this chapter and in subsection 2 of section 41-02-48:
>
>    a. A security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and
>
>    b. A security interest attaches to any identifiable proceeds of collateral.
>
> 2. Proceeds that are commingled with other property are identifiable proceeds:
>
>    a. If the proceeds are goods, to the extent provided by section 41-09-56; and
>
>    b. If the proceeds are not goods, to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this chapter with respect to commingled property of the type involved.

N.D.C.C. § 41-09-35. Although there appears to be no North Dakota common law interpreting these statutes, courts interpreting similar statutes agree that the security agreement that attached to the collateral (including accounts receivable), attaches to the proceeds as well. See Swanson v. Applied Process Tech. Int'l (In re Delta-T Corp.),

475 B.R. 495, 531 (Bankr. E.D. Va. 2012) ("By definition, the funds collected on the accounts created in favor of Delta–T by the sales of the steel to Central City and Pasco constitute proceeds of the accounts because the accounts constituted collateral under the Security Agreements at their creation."); Inv. Hotel Props. v. New W. Fed. Sav. & Loan Assoc. (In re Inv. Hotel Props.), 109 B.R. 990, 995 (Bankr. D. Colo. 1990) ("Also, the payment on an account receivable is proceeds of the account receivable.") (citations omitted).

Hartford's security interest attached to bonded contract receivables and the rights to proceeds of these receivables under section 41-09-13. Pro-Mark deposited these proceeds in a bank account with CCU. Under section 41-09-35(1)(a), this security interest continues in the receivables unless Hartford authorized the disposition free of the security interest. There is no evidence Hartford released these proceeds. To the extent Pro-Mark commingled these proceeds, the security interest attaches only to those proceeds that are identifiable. See N.D.C.C. § 41-09-35(2)(b); In re Vision Care of Me. Ltd. Liab. Co., 2025 WL 816725, at *3 (Bankr. D. Me. Mar. 13, 2025) ("Commingling alone, however, would not have prevented Besse Medical's security interest from attaching to, becoming automatically perfected in, and remaining perfected in the cash proceeds. If Besse Medical can identify, through a permissible tracing method, any cash proceeds of its original collateral among funds in the joint bank account, Besse Medical's security interest would have (1) attached to those identifiable cash proceeds[.]") (citations omitted).

Although there is no evidence that Hartford perfected its security interest in the assigned right to bonded contract receivables and their proceeds, this status does not

impair Hartford's right to earned but unpaid bonded contract funds because the Intercreditor Collateral Agreement grants it priority to this collateral as between CCU and Hartford. Hartford's security interest in bonded contract funds is a lien under the Intercreditor Collateral Agreement. Bankr. Case 24-30167, Doc. 72-4 at Covenants ¶ 2; see also 11 USC § 101(51A) ("The term 'security interest' means lien created by an agreement."). Under the Intercreditor Collateral Agreement, Hartford's liens in Surety Priority Collateral are senior and superior to CCU's liens, regardless of the relative times of attachment or perfection. Surety Priority Collateral includes Bonded Contracts and the proceeds of these contracts. Accordingly, Hartford's claim to identifiable bonded contract receivables and their proceeds less nonbonded contract proceeds is senior and superior to CCU's liens.

Hartford offered bank statements showing deposits of several bonded contract payments. Without briefing on the method of tracing and details regarding the complete scope of identifiable bonded contract receivables, there remain questions of fact precluding summary judgment in favor of either Hartford or CCU on their claims and causes of action related to these funds.

The definition of "Surety Priority Collateral" in the Intercreditor Collateral Agreement includes no reference to nonbonded contracts or receivables. Accordingly, to the extent these proceeds are identified, they are not Surety Priority Collateral.

**iii. CCU Did Not Establish, As a Matter of Law, That Funds Held for Ordinary Course Payments Were "Ordinary Course Payments" Under the Intercreditor Collateral Agreement**

According to the Undisputed Statement of Material Facts, the S-1 Deposit Account received three transfers from Pro-Mark's S-12 Deposit Account in the sum of $284,434.88 each on January 15, 2024, February 15, 2024, and March 15, 2024, totaling $853,304.64. CCU made these transfers according to the terms of the Amendment to Modification Agreement dated January 12, 2024. CCU claims these transfers were "Ordinary Course Payments" under the terms of the Intercreditor Collateral Agreement, and its setoff of these funds was not a breach of this agreement.

Section 5.e of the Intercreditor Collateral Agreement provides that, regardless of Hartford's liens in Surety Priority Collateral, CCU "may accept and retain all Ordinary Course Payments." Bankr. Case No. 24-30167, Doc. 72-4, Covenants § 7(e). The Intercreditor Collateral Agreement defines an "Ordinary Course Payment" as any "payment, prepayment, or repayment" from Pro-Mark to CCU, providing these payments are not made: (a) after CCU accelerated Pro-Mark's debt following a "Bank Event of Default"; or (b) during a "Surety Event of Default Period." Id. at Covenants § 2. The last sentence of this definition provides clarifying language: "For the avoidance of doubt, all insurance and condemnation proceeds received by the Bank in accordance with Section 13.a., below, shall be deemed, to the extent applied to the Bank Debt, to be Ordinary Course Payments." Id.

CCU asserts that under this definition, any portion of the Deposit Account Funds that were payments, prepayments, or repayments from Pro-Mark to CCU, made prior to

CCU's acceleration of Pro-Mark's debt, and outside a Surety Event of Default Period, were Ordinary Course Payments that CCU may retain even if Hartford held a lien against the same funds that attached to Surety Priority Collateral. CCU claims these $284,434.88 monthly transfers were payments, prepayments, or repayments to CCU on Pro-Mark's loan.

The parties agree, and the Stipulated Statement of Undisputed Material Facts confirms that CCU's transfer of these funds from the S-12 account to the S-1 account took place before either of the conditions included in the definition of Ordinary Course Payments. The parties stipulated that, "As of the Petition Date, CCU had not accelerated Pro-Mark's debts owed to CCU." Doc. 56 at ¶ 22. The parties also stipulated that, "As of the Petition Date, Hartford had not provided written notice to CCU of any default by Pro-Mark under the Intercreditor Agreement or related documents." Id. at ¶ 23. In fact, there is no evidence that Pro-Mark defaulted on any duty owed to Hartford until it stopped performing on its bonded contracts, which Bragg testified occurred after Pro-Mark petitioned for bankruptcy relief.

Hartford insists CCU's transfer of funds from Pro-Mark's deposit account into its restricted account are not Ordinary Course Payments. Instead, Hartford claims CCU and Pro-Mark entered into a modification agreement after bonded contract funds were deposited into Pro-Mark's deposit account and redirected those funds (which CCU agreed to hold in trust for Hartford in the Intercreditor Collateral Agreement) to pay down a preexisting debt it was owed by Pro-Mark. Hartford characterizes this conduct as "an after-the-fact modification of the rights of Hartford's collateral, without Hartford's consent." Doc. 58 at 25.

In light of the timing, the Court is not persuaded by Hartford's suggestion that CCU needed Hartford's consent to make the fund transfers or that CCU facilitated "an after-the-fact modification of the rights of Hartford's collateral." Between January and March 2024 when CCU transferred the funds, Pro-Mark had not yet stopped performing or defaulted on the General Indemnity Agreement assignment. Until the petition date/default date, Pro-Mark retained the right to transfer and spend the money it earned, and Hartford had no right to claim the bonded contract proceeds or to demand that CCU hold them on its behalf.

Given the timing and the circumstances outlined by the January 12, 2024, Amendment to the Modification Agreement, the Court is also not convinced that CCU's transfer of $853,304.64 from Pro-Mark's S-12 account to the S-1 account equates to an "Ordinary Course Payment."

Under the terms of the Amendment to the Modification Agreement, CCU allowed Pro-Mark to defer payments toward a revolving line of credit loan to May 15, 2024. In return, Pro-Mark agreed to allow CCU to transfer the $853,304.64 to "Pro-Mark's restricted Regular Share account." Pro-Mark also agreed:

> [T]he funds in the S1 will be held and controlled in the account within the sole discretion of the Credit Union. The parties agree said funds shall be <u>subject to</u> the Credit Union's right of set-off against the loan balances owing by Pro-Mark to the Credit Union and shall also be considered as <u>additional collateral</u> on said loans and are pledged as collateral for said loans. To avoid any doubt, Pro-Mark agrees the funds will be unavailable to Pro-Mark and it will not have control over any of the current or future funds deposited in the restricted share account. The Credit Union will have full control over the restriction on the funds.

Bankr. Case No. 24-30167, Doc. 72-3 at 19-20 (emphasis added). The parties agreed to the following payment structure:

> (a) For the period from January 15, 2024 through April 15, 2024, Pro· Mark will make the following monthly payments (the "Monthly Payments") on the following due dates:
>
> - January 15, 2024 - $11,940.32
> - February 15, 2024 - $11,940.32
> - March 15, 2024 - $11,940.32
> - April 15, 2024 - $11,940.32
>
> (b) Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on May 15, 2024.

Id. at 20.

It is apparent from the terms of the Amendment to Modification Agreement that CCU's fund transfers to a restricted account were intended to serve as additional security—not payments.[15] Pro-Mark did not deliver the funds to CCU, CCU did not accept or setoff the funds at the time, and CCU did not apply the funds and reduce Pro-Mark's debt obligation accordingly. Rather, CCU transferred the funds to a restricted Pro-Mark account, and they remained there until after the petition date. Even the last sentence of the definition of Ordinary Course Payment suggests that money CCU receives is not an Ordinary Course Payment until applied to debt.

[15] Under North Dakota law related to contract interpretation, "Performance of an obligation for the delivery of money only is called payment." N.D.C.C. § 9-12-06. Black's Law Dictionary defines payment as:

> 1. Performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation.
>
> 2. The money or other valuable thing so delivered in satisfaction of an obligation.

Payment, Black's Law Dictionary (12th ed. 2024).

The parties anticipated that Pro-Mark would make four $11,940.32 payments between January 2024 and April 2024 and a large lump sum payment on May 15, 2024. The $11,940.32 payments Pro-Mark made before the petition date are "Ordinary Course Payments" under the Intercreditor Collateral Agreement. The transfer of $853,304.64 from the S-12 account to the S-1 account as additional collateral is not, as a matter of law, an "Ordinary Course Payment."[16] CCU's arguments to the contrary are rejected.

### D. Competing Claims to Pro-Mark's Equipment

#### 1. Pro-Mark's Equipment is Not Subject to Hartford's Equitable Subrogation Claim and the Assignment in the General Indemnity Agreement did not Transfer an Ownership Interest in Pro-Mark's Equipment to Hartford

CCU argues that Hartford's right to equitable subrogation does not extend to Pro-Mark's equipment. The Court agrees. The rationale for finding an equitable right to subrogation and attaching an equitable lien against bonded contract receivables does not apply to Pro-Mark's equipment. See State Bank & Tr. Co. v. Ins. Co. of the W., 132 F.3d 203, 207 (5th Cir. 1997) (noting that the "courts that have considered this issue have held that secured creditors holding perfected security interests in a defaulting contractor's tangible personal property retain their priority over a completing surety's equitable claims" and agreeing that "when tangible personal property—distinct from

[16] Hartford claims that CCU transferred the $853,304.64 in "bonded contract funds into an account subject to CCU's unilateral control and then applying them to Pro-Mark's outstanding debt" or that CCU made a "unilateral payment to itself of bonded contract funds" confuses the issue. See Doc. 68 at 8-9. CCU does not argue, and the Court does not find, that CCU's setoff of sums deposited in Pro-Mark's accounts following the Order Granting Relief from the Automatic Stay is an "Ordinary Course Payment." CCU claims the $284,434.88 monthly transfers from Pro-Mark's S-12 account to its S-1 (a restricted account) were payments, prepayments, or repayments qualifying them as "Ordinary Course Payments" under the Intercreditor Collateral Agreement. Doc. 62 at 12.

contract proceeds—is at issue, the rationale for elevating the surety over the secured creditor has no application").

As one court explained:

> [T]he surety has done nothing with respect to the bankrupt creditor's equipment which raises up in the surety an equity superior to that of later judgment creditors. The equitable lien protects the surety whose performance enables funds to become available, but in the case of equipment the surety is in no better position than any other unsecured creditor. The surety cannot accede to the general assets of the contractor absent some assignment of title or attachment through a perfected security interests [sic].

U.S. Fid. & Guar. Co. v. Leach (In re Merts Equip. Co.), 438 F.Supp. 295, 298 (M.D. Ga. 1977); see also Aetna Cas. & Sur. Co. v. J. F. Brunken & Son, Inc., 357 F.Supp. 290, 293–94 (D.S.D. 1973) (holding that equitable subrogation does not apply to the proceeds from the sale of equipment and the surety was not entitled to an equitable lien in sale proceeds; finding that the interest the surety sought to enforce is a security interest subject to Article 9); U.S. Fid. & Guar. Co. v. United Penn Bank, 524 A.2d 958, 965 (Pa. Super. Ct. 1987) ("We hold, therefore, that where a creditor has obtained a perfected security interest in personal property owned by a defaulting contractor, the rights of the secured creditor in and to such personal property are superior to and have priority over a claim thereto asserted by an unsecured surety which has been compelled to pay claims made by materialmen against the contractor."). Accordingly, Hartford does not have the right to equitable subrogation, and it is not entitled to an equitable lien in Pro-Mark's equipment.

Additionally, the assignment language in the General Indemnity Agreement did not assign an ownership interest in equipment because: (1) the Court is not convinced that the assignment provision transferred an ownership interest in equipment when the

parties signed the General Indemnity Agreement; and (2) there is no evidence in the record that Hartford demanded enforcement of the right conveyed.

Consequently, to resolve the dispute over funds deposited in Pro-Mark's accounts, the Court looks to the General Indemnity Agreement between Pro-Mark and Hartford and the Intercreditor Collateral Agreement, which establish the relative priorities of Hartford and CCU and their respective rights to Pro-Mark's assets.

**2. Hartford Holds a Security Interest in Pro-Mark's Equipment**

Paragraph 20 of the General Indemnity Agreement provides that the "Agreement constitutes a Security Agreement in favor of Hartford." Bankr. Case No. 24-30167, Doc. 72-1; Doc. 58-3. The language in and purpose of the General Indemnity Agreement and Hartford's and Pro-Mark's course of conduct show the parties intended the assignment provision to be security for any loss Hartford incurred. See In re Apex Oil Co., 975 F.2d at 1369. As with bonded contract receivables discussed above, the Court finds that the parties to the General Indemnity Agreement intended the assignment to serve as security, and the agreement is evidence of a security interest in the collateral assigned.

The evidence also shows that Pro-Mark granted Hartford a security interest that attached under North Dakota law. As partial consideration for Hartford's execution of bonds and other consideration, Pro-Mark executed two General Indemnity Agreements in favor of Hartford, dated July 14, 2020, and July 8, 2022. Hartford provided the bonds Pro-Mark needed in consideration for the security provided in the General Indemnity Agreements. Pro-Mark held prepetition rights to payments under the contracts it

entered with the United States, and Pro-Mark signed the General Indemnity Agreement purporting to be a security agreement creating a security interest in favor of Hartford.

The General Indemnity Agreement also satisfies the last requirement, a description that reasonably identifies the collateral. Under N.D.C.C. § 41-09-08(1), a description of the collateral in a security agreement is sufficient "regardless of whether the description is specific, if the description reasonably identifies what is described." Subsection 9(b) of the General Indemnity Agreement grants an interest to Hartford in "All right, title and interest of the Indemnitors in and to; (2) all supplies, tools, plant, machinery, inventory, equipment, and materials[.]" Bankr. Case No. 24-30167, Doc. 72-1, at ¶ 9(b); Doc. 58-3. The Court finds that the assignment provision in the General Indemnity Agreement sufficiently describes Pro-Mark's equipment. See United Bank of Bismarck v. Selland, 425 N.W.2d 921, 922–24 (N.D. 1988) (holding that a collateral description of "All Equipment, Machinery and Farm Products … adequately fulfills the purpose ascribed to it under the Uniform Commercial Code and is not unacceptably vague in its designation of the property involved."); Ziebarth v. Dakota W. Bank (In re Ziebarth), 1989 WL 1107877, at *4 (Bankr. D.N.D. Mar. 2, 1989) (citation omitted) ("The North Dakota Supreme Court has concluded that the description, 'all farm machinery, equipment and farm products' was sufficient for a security agreement.").

Pursuant to section 41-09-35 of the North Dakota Century Code, Hartford's security interest in equipment continues in the identifiable proceeds from the sale of Pro-Mark's equipment, if any.

Accordingly, Hartford holds a security interest that attached to Pro-Mark's equipment existing as of the date the parties signed the General Indemnity Agreement.

The security interest does not attach to equipment Pro-Mark purchased after the parties signed the July 2022 General Indemnity Agreement because there is no language in this agreement suggesting the parties intended the assignment to apply to after-acquired equipment. See In re Ferro, 228 B.R. 700, 705–06 (Bankr. W.D. Mo. 1999); Nacio Inv. Grp. v. Nacio Sys., Inc. (In re Nacio Sys., Inc.), 410 B.R. 38, 42 (Bankr. N.D. Cal. 2009). Unlike accounts, there is no presumption of a floating lien applicable to equipment.

Although there is no evidence that Hartford perfected its security interest in the assigned right to equipment, this status does not impair Hartford's right to Pro-Mark's equipment purchased for, installed in, or allocated to any bonded contract or the proceeds of this equipment because the Intercreditor Collateral Agreement grants it priority to this collateral as between CCU and Hartford. Hartford's security interest in bonded contract funds is a lien under the Intercreditor Collateral Agreement. Bankr. Case No. 24-30167, Doc. 72-4 at Covenants ¶ 2; see also 11 U.S.C. § 101(51A) ( "The term 'security interest' means lien created by an agreement."). Under the Intercreditor Collateral Agreement, Hartford's liens in Surety Priority Collateral are senior and superior to CCU's liens, regardless of the relative times of attachment or perfection. Surety Priority Collateral includes Bonded Working Assets and the proceeds of these assets. Accordingly, Hartford's claim to equipment Pro-Mark owned on or before July 8, 2022, that Pro-Mark purchased for, installed in, or allocated to any bonded contract as well as the proceeds of this equipment, is senior and superior to CCU's liens.

## IV. SUMMARY OF CONCLUSIONS AND RULINGS ON MOTIONS

For the reasons provided above, **IT IS ORDERED**:

1. CCU's Motion for Summary Judgment on Count I, seeking a declaration that Pro-Mark owns all legal and equitable interest in accounts receivable under 11 U.S.C. § 541, is granted in part and denied in part. CCU's Motion for Summary Judgment on Count II, seeking a declaration that CCU's security interest in Pro-Mark's accounts receivables is superior to Hartford's claims against the accounts receivables is granted in part and denied in part.

   a. Hartford holds an equitable interest in earned but unpaid bonded contract receivables totaling $89,273.85 for work Pro-Mark performed on the Offutt AFB – Simulator Contract, but the United States is not authorized to release these funds until Hartford completes the work remaining on this project. Hartford's equitable interest in these proceeds is superior to the bankruptcy estate's interest and CCU's security interest. To the extent CCU seeks a declaratory judgment to the contrary, its Motion for Summary Judgment is denied.

   b. Hartford also holds an equitable interest in earned but unpaid bonded contract receivables totaling $39,498.01 from Pro-Mark's work on the Minot AFB – Windows Task Order. The United States is authorized to release these bonded contract funds to Hartford. Hartford's equitable interest in these proceeds is superior to the bankruptcy estate's interest and CCU's security interest. To the

extent CCU seeks a declaratory judgment to the contrary, its Motion for Summary Judgment is denied.

c. To the extent the United States is holding retained funds on a contract bonded by Hartford where Hartford's losses exceed the sum retained on that contract, Hartford has an equitable interest in these retained proceeds. Hartford's equitable interest in these proceeds is superior to the bankruptcy estate's interest and CCU's security interest. To the extent CCU seeks a declaratory judgment to the contrary, its Motion for Summary Judgment is denied.

d. Hartford holds a security interest in earned but unpaid bonded contract receivables that is senior and superior to CCU's security interest under the Intercreditor Collateral Agreement. Hartford's interest in these proceeds is superior to the bankruptcy estate's interest. To the extent CCU seeks a declaratory judgment to the contrary, its Motion for Summary Judgment is denied.

e. Hartford does not hold an equitable or legal interest in earned but unpaid nonbonded contract receivables. The $146,831.25 in contract receivables disbursed to the bankruptcy estate for work Pro-Mark performed on nonbonded contracts is property of the bankruptcy estate and may be disbursed according to Bankruptcy Code priorities. CCU's security interest in these proceeds is superior to Hartford's interests. CCU's Motion for Summary Judgment is granted as to these funds.

f. Hartford does not hold an equitable or legal interest in nonbonded contract receivables Pro-Mark deposited in its account with CCU. These proceeds are property of the bankruptcy estate and may be disbursed according to Bankruptcy Code priorities. CCU's security interest in these proceeds is superior to Hartford's interests. CCU's Motion for Summary Judgment is granted as to these funds.

g. Hartford does not hold a legal or equitable interest in the $1,900,000 settlement proceeds Pro-Mark received in July 2023 and deposited in its account with CCU. The bankruptcy estate's interest and CCU's interest in these proceeds is superior to Hartford's interests. CCU's Motion for Summary Judgment is granted as to these funds.

h. Hartford holds a security interest in identifiable bonded contract receivables and their proceeds Pro-Mark deposited in its account with CCU. Without briefing on the method of tracing and details regarding the complete scope of identifiable bonded contract receivables, there remain questions of fact precluding summary judgment in favor of either Hartford or CCU on their claims and causes of action related to these funds.

i. CCU did not establish, as a matter of law, that funds transferred from Pro-Mark's S-12 account to Pro-Mark's restricted regular share account were "Ordinary Course Payments" under the Intercreditor Collateral Agreement.

2. CCU's Motion for Summary Judgment on Count III, seeking a declaration that Pro-Mark owns all legal and equitable interests in its equipment under 11 U.S.C. § 541, is denied. CCU's Motion for Summary Judgment on Count IV, seeking a declaration that CCU's security interest in Pro-Mark's equipment is superior to Hartford's claims against the equipment is denied because there are questions of fact precluding summary judgment. To the extent Hartford seeks judgment on its Counterclaim - Third Claim for Relief, declaring that Hartford has an interest superior to CCU in Pro-Mark's equipment used on bonded contracts, its motion is denied because there are questions of fact precluding summary judgment. To the extent Hartford seeks judgment on its Crossclaim - Second Claim for Relief, declaring that Hartford's interest in Pro-Mark's equipment, or the proceeds derived from the sale of Pro-Mark's equipment are owed to Hartford and should not become part of Pro-Mark's estate, its motion is denied because there are questions of fact precluding summary judgment.

a. Pro-Mark's equipment is not subject to Hartford's equitable subrogation or equitable lien claims and the assignment in the General Indemnity Agreement did not transfer an ownership interest in Pro-Mark's equipment to Hartford.

b. Hartford holds a security interest in the equipment Pro-Mark owned at the time Pro-Mark and Hartford signed the General Indemnity Agreements and the proceeds traceable to the sale of this equipment. This security interest is senior and superior to CCU's

liens in equipment Pro-Mark purchased for, installed in, or allocated to any bonded contract.

c. Because it is not clear whether any of Pro-Mark's equipment falls within the scope of Hartford's security interest, questions of fact preclude the Court from ruling as a matter of law.

3. Hartford's Motion for Summary Judgment on its Counterclaim - First Claim for Relief, Breach of Contract is denied because there are questions of fact precluding summary judgment.

4. Hartford's Motion for Summary Judgment on its Counterclaim - Second Claim for Relief, seeking a declaration that Hartford has an interest superior to CCU in the $587,707.49 owed to Pro-Mark stemming from work performed on Air Force Contracts is granted in part and denied in part. Hartford's Motion for Summary Judgment on its Crossclaim – First Claim for Relief, seeking a declaration that Hartford's interest in the earned but unpaid bonded contract proceeds is such that the funds should not become part of Pro-Mark's estate is granted in part and denied in part.

a. Hartford holds an equitable interest in earned but unpaid bonded contract receivables totaling $89,273.85 for work Pro-Mark performed on the Offutt AFB – Simulator Contract, but the United States is not authorized to release these funds until Hartford completes the work remaining on this project. Hartford's equitable interest in these proceeds is superior to the bankruptcy estate's

interest and CCU's security interest. Hartford's Motion for Summary Judgment is granted as to these funds.

b. Hartford also holds an equitable interest in earned but unpaid bonded contract receivables totaling $39,498.01 from Pro-Mark's work on the Minot AFB – Windows Task Order. The United States is authorized to release these bonded contract funds to Hartford. Hartford's equitable interest in these proceeds is superior to the bankruptcy estate's interest and CCU's security interest. Hartford's Motion for Summary Judgment is granted as to these funds.

c. To the extent the United States is holding retained funds on a contract bonded by Hartford where Hartford's losses exceed the sum retained on that contract, Hartford has an equitable interest in these retained proceeds. Hartford's equitable interest in these proceeds is superior to the bankruptcy estate's interest and CCU's security interest. Hartford's Motion for Summary Judgment is granted as to these funds, if any.

d. Hartford holds a security interest in earned but unpaid bonded contract receivables that is senior and superior to the bankruptcy estate's interest and CCU's security interest under the Intercreditor Collateral Agreement. Hartford's Motion for Summary Judgment is granted as to these funds.

e. Hartford does not hold an equitable or legal interest in earned but unpaid nonbonded contract receivables. The $146,831.25 in

contract receivables disbursed to the bankruptcy estate for work Pro-Mark performed on nonbonded contracts is property of the bankruptcy estate and may be disbursed according to Bankruptcy Code priorities. The bankruptcy estate's interest and CCU's security interest in these proceeds is superior to Hartford's interests. Hartford's Motion for Summary Judgment is denied as to these funds.

i. Hartford failed to show, as a matter of law, that the provisions of the General Indemnity Agreement created a valid trust under North Dakota law.

5. The United States' Motion for Summary Judgment, seeking a ruling that it may make payments in accordance with the United States Air Force's accounting of the pending work performed and amounts owed on the date Pro-Mark petitioned for bankruptcy relief is granted. The United States is authorized to pay the $440,876.24 to Hartford providing Pro-Mark earned these funds on bonded contracts. To the extent Pro-Mark earned these funds on nonbonded contracts, these funds must be paid to the bankruptcy estate to be distributed according to Bankruptcy Code priorities.

Dated: October 14, 2026.

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT